UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

01 JUL 31 PM 12: 43

N.D. OF ALABAMA

| | | |
|---|---|---|
| JAMES DAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-97-S-1289-S |
| | ) | |
| THE BOARD OF TRUSTEES OF | ) | |
| THE UNIVERSITY OF ALABAMA | ) | |
| IN BIRMINGHAM, | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED

JUL 3 1 2001

## MEMORANDUM OPINION

This is a disability discrimination case. Plaintiff, James Dailey, was discharged from his

position as a painter for the University of Alabama at Birmingham when he failed to appear for

substance abuse testing. He contends that defendant thereby violated the Americans with

Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act of 1973, 29

U.S.C. § 704 *et seq.*, and state contract law.[1] The action presently is before the court on defendant's

original and amended motions for summary judgment (doc. nos. 32 & 47), asserting that plaintiff's

claims are barred by the Eleventh Amendment. Upon consideration of the motions, pleadings, and

briefs, this court concludes the motions are due to be granted.

### I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is

proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

---

[1]Plaintiff also asserted claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and 42 U.S.C. § 1983, which were dismissed by this court's order of August 4, 2000 (doc. no. 44). Plaintiff initially asserted claims against Harry Shugerman and Olen Pruitt, all of which were dismissed by the same order.

material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.

56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct.

2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) *(en banc)* (quoting *Haves v. City*

*of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted); *see*

*also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) *(en banc)*.

## II. FACTS

James Dailey was hired to work as a painter for the Maintenance Department of the

University of Alabama at Birmingham ("UAB") on October 22, 1990.[2]  His employment was

uneventful for almost five years, until Dailey informed his supervisor, Grady Shouse,[3] that he had

a substance abuse problem.[4]

---

[2]Plaintiff's evidentiary submission (doc. no. 43), Tab 1 (Deposition of plaintiff, James Dailey) at 30.

[3]Id. at 17 ("Well, one morning that I reported to work, I went to him privately in his office, and I told him that I needed to get some help because I had a problem.").

[4]Plaintiff's "problem" involved "losing control financially," *id.* at 12, as a result of cocaine and alcohol dependency. *Id.* at 27-30.

Shouse assisted Dailey in obtaining a medical leave of absence,[5] to allow him to enter a 21-day, in-patient treatment program at a substance abuse rehabilitation facility operated by Bradford-Parkside Health Services. Dailey entered the program on September 25, 1995.[6] He was paid during his rehabilitation.[7]

Dailey was visited during his first day at Bradford by Reita Mann, director of UAB's Faculty and Staff Assistance Program.[8] She presented him a form entitled "Statement of Guidelines for Impaired Employees." Among other things, that form provided:

> Employees returning to work after treatment for drug abuse must submit to periodic drug testing at a minimum of once per month for a period of two years. Employees will be notified of the specific frequency of their periodic drug screens before they return to work. These drug tests will be called on a randomized basis and urine and/or blood specimens must be submitted to a UAB-approved collection site. The employee is responsible for the cost of these drug screens.
>
> . . . .
>
> *Failure to submit to a screen or a positive test may result in termination without notice.*[9]

Dailey signed the form, thereby agreeing to submit to randomized drug testing for a period of two years, and, acknowledging that his failure to submit to a drug screen, or a positive test, could result in termination of his employment without notice.[10]

---

[5]*Id.* at 17-18.

[6]*Id.*, Ex. 1 (Bradford Discharge Summary).

[7]*Id.* at 23 ("It was paid leave, because I had the sick time there.").

[8]Among other things, the UAB Faculty and Staff Assistance Program provided financial assistance during plaintiff's rehabilitation. See id. At 41 ("Well, a lot of things they did — For one thing I know that they did, I had a son in college, and they helped pay some tuition fees that he and I owed. It helped buy some books. They assist the employees and what they need as far as bills paid and things like that.").

[9]*Id.*, Ex. 3, ¶ IV (emphasis supplied).

[10]Plaintiff admitted during deposition that his participation in the Faculty and Staff Assistance Program was a condition of his continued employment at UAB: *id.* at 42 ("they [Harry Shugarman & Olen Pruitt] told me that I had to continue the program in order to stay employed"); *id.* ("He [Shugarman] told me in order to continue my employment at UAB, I must continue the program on a color-code system for two years once a month."); *id.* at 51 (acknowledging

The testing procedure employed by UAB utilized a color code system to inform employees when they were required to submit to a drug screen.  Employees were assigned a color, and were instructed to telephone a certain number each day to listen to a recording that announced the date and a color.[11]  If the color assigned to the employee was voiced, the employee was required to report for drug testing before the end of the following day.[12]

On October 13, 1995, two days before his discharge from Bradford, Dailey signed a second form, acknowledging his understanding of UAB's color code and call-in system.  The form provided

that he understood his employment could be "terminated for failing to appear on the day your color required you to come be tested"); and *id.* at 53:

> Q. That's not what I'm asking you.  I'm saying, assuming you call on Thursday, your color black is called.  You know that you now have to be tested on that Thursday or the next Friday; correct?
>
> A. Yes.
>
> Q. Let's say you know your color [was] called, and for whatever reason —— you may be dirty or you may not have the money or you may be scared to go or whatever reason —— you don't go get tested on Thursday or Friday.  *Was it your understanding that you could be terminated for failing to show up for that random test on the day it was called?*
>
> A. *Yes.*  [Emphasis supplied.]

[11]*Id.* at 71 (The recording "gives you the day.  It gives you the color, and if I'm not mistaken, it might give you the time."); *see also id.* at 72-73.

[12]*Id.*, Ex. 6 ("Addiction Recovery Program (ARP) Instructions for Color Code, Random Unirnalysis" signed by plaintiff on December 19, 1995), and providing in part:

(1)   You will be assigned a color by the ARP service.

(2)   You will call the following number *every day including Saturday and Sunday* (you may call any time day or night):  *934-9644.*

(3)   A recording will give you the color of the day.  If your color comes up, you will report to the Lab Corp Lab the *next day* to leave a urine specimen.  (For example:  You call on Monday.  Your color is given on the recording.  Then you will come in on Tuesday to leave a urine.)
Note:   Be sure to call the number every day to get the correct color for the next day.  [Emphasis in original.].

*But see id.* at 52 (where plaintiff states he was supposed to report for testing "[t]he same day [his color was announced] or the next day"), and 63 ("And I also understand [sic] that I could come in the same day.").  In the context of the facts of this case, however, that distinction makes no difference, because plaintiff failed to report for testing on either day.

the telephone number to be called, and assigned Dailey the color "black."[13]  Dailey completed the

rehabilitation program on October 15, 1995,[14] and became subject to the requirements of UAB's

random drug screening procedures on that date.  He was subjected to random examinations twice

a month during the first two months following discharge from Bradford (none were positive), but

thereafter only once each month.[15]

Mann sent a memorandum to Dailey on December 11, 1995, informing him that UAB would

implement revised drug screening procedures, beginning January 1, 1996.  Dailey was directed to

report to a different testing facility, and given a new telephone number, which he was required to call

each day of the week.[16]  (Under the preexisting practice, Dailey had been required to call only five

days a week.[17])  He again was assigned the color "black."

Dailey worked a full day on Thursday, January 18, 1996.  He telephoned the screening

number too early that day, and heard the recorded message for the previous day.[18]  He forgot to call

back later in the day, and consequently failed to learn that the color for that Thursday was "black."[19]

---

[13]*Id.*, Ex. 4, providing:

I have received my color code [black] and I understand how to use the call-in urine drug screen phone number to determine when I am to report for random drug screening.  [The original number assigned was 647-8718.]

I understand that it my responsibility to call the number daily to see if my color has been selected.  Failure to come in for a screening will result in notification to the person(s) to whom my screenings are reported.

I understand that a fee of $35.00 must be paid at the time of collection of the urine drug screen.

[14]*Id.*, Ex. 1 (Bradford Discharge Summary).

[15]*Id.* at 55-56.

[16]*Id.* at 60-61 & Ex. 5.

[17]*Id.* at 56-58.

[18]*Id.* at 71; *see also supra* note 11 and related text.

[19]*Compare id.* at 66 ("I just forgot" to call on Thursday, January 18, 1996), *with id.* at 70-71 ("But what I did, I called too early.  And so I ... didn't call back, forgot to call back.").

He telephoned the recording system the following day, Friday, January 19, 1996, but his color was not announced.

On Monday, January 22, 1996, Dailey reported to work at the usual time. During lunch, Mr. Shouse instructed him to report to the office of Olen Pruitt, the director of maintenance operations, at one o'clock. Pruitt informed Dailey that he had violated the conditions of UAB's program by failing to appear for drug testing the preceding Friday. Dailey asked to be allowed to take another test, that same day, but Pruitt refused, saying: "Well, it's not up to me, James. You forgot to call, and we've got to go by the program."[20] Pruitt directed Dailey to turn in his keys and badge, and placed him on administrative leave pending an investigation. On February 1, 1996, Dailey received a letter informing him that his employment had been terminated.[21] This action followed.

### III. DISCUSSION

Defendant contends Dailey's claims under the ADA, the Rehabilitation Act, and state contract law are barred by the Eleventh Amendment. Defendant alternatively asserts that Dailey is not disabled, that he failed to cast doubt upon defendant's stated, non-discriminatory reason for firing him, that a request for a "second chance" is not a request for reasonable accommodation, and that UAB's drug testing program is reasonable.

**A.    The Eleventh Amendment**

The Eleventh Amendment limits the power of federal courts to hear suits instituted by private litigants against a state. The Amendment itself is quite brief, containing only forty-three words: its full text provides that "The Judicial Power of the United States shall not be construed to extend to

---

[20]*Id.* at 70.

[21]*Id.*, Ex. 7.

-6-

any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

Despite the Amendment's brevity and clarity of expression — explicitly denying federal courts the power to decide suits against states brought by only two classes of plaintiffs, "Citizens of another State" or "Citizens or Subjects of any Foreign State" — the Supreme Court has layered a case law gloss on the Amendment's language that "is replete with historical anomalies, internal inconsistencies, and senseless distinctions." Howard Fink and Mark V. Tushnet, *Federal Jurisdiction: Policy and Practice* 137 (1984).

For example, the Supreme Court long ago interpreted the Amendment as barring federal court suits against a state by its own citizens. *Hans v. Louisiana*, 134 U.S. 1, 13-15, 10 S.Ct. 504, 506-07, 33 L.Ed. 842 (1890) (holding that the doctrine of sovereign immunity barred a person from suing his own state in federal court, even when the basis of the claim was a federal question arising under the laws or Constitution of the United States); *see also, e.g., Edelman v. Jordan*, 415 U.S. 651, 662-663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974) ("[T]his Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.").

The Court also has held that a plaintiff's claim based upon a federal statute is barred when it is filed in the defendant state's own court system, rather than a federal forum. *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (holding that state employees could not subject their state to suit in the state's own court system to recover damages for violation of the overtime provisions of the Fair Labor Standards Act of 1938, because Congress lacked the power under Article I of the Constitution to abrogate the states' sovereign immunity to suit in their own courts

-7-

upon claims based on federal statutes).

The bases for such conclusions are obscure at best, especially when read beside the scant, forty-three words of the Amendment itself. The murkiness results from the confluence of powerful historical streams: "the non-constitutional but ancient doctrine of sovereign immunity," *Fitzpatrick v. Bitzer*, 427 U.S. 445, 457, 96 S.Ct. 2666, 2672, 49 L.Ed.2d 614 (1975) (Brennan, J., concurring); and,

> the Constitution's structure, ... its history, and the authoritative interpretations by the [Supreme] Court [which] make clear [that] the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments.

*Alden*, 527 U.S. at 713, 119 S.Ct. at 2246-47.

In any event, as presently construed, the Eleventh Amendment comes down to this proposition: "nonconsenting States may not be sued by private individuals in federal court." *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, ___, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2001) (citing *Kimel v. Florida Board of Regents*, 528 U.S. 62, 73, 120 S.Ct. 631, 640, 145 L.Ed.2d 522 (2000) ("[T]he Constitution does not provide for federal jurisdiction over suits against nonconsenting States.").

### 1.   Avoidance of the states' sovereign immunity

Eleventh Amendment immunity can be averted. The Supreme Court has recognized three situations in which a state may be subjected to suit in federal court. First, a state may affirmatively waive its sovereign immunity and consent to suit in federal court. *See, e.g., Clark v. Barnard*, 108 U.S. 436, 447-48, 2 S.Ct. 878, 883-84, 27 L.Ed. 780 (1883) (holding that a state's intervention in

a federal court action "would be a voluntary submission to its jurisdiction").[22]

> A State may effectuate a waiver of its constitutional immunity by a state statute or constitutional provision, or by otherwise waiving its immunity to suit in the context of a particular federal program. In each of these situations, we require an unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment. As we said in *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974), "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here."

*Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 238 n.1, 105 S.Ct. 3142, 3145 n.1, 87 L.Ed.2d 71 (1985).[23]

Further, states and state officials may be sued by private individuals in actions seeking *prospective* injunctive relief for *continuing* violations of federal law. *See Ex Parte Young,* 209 U.S. 123, 155-56, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908).[24]

---

[22] *But see Lapides v. Bd. of Regents,* __ F.3d __, 2001 WL 561352, at *5 (11th Cir. May 24, 2001) (holding that a state official's act of removing a § 1983 suit containing supplemental state law claims to federal court does not amount to waiver of the state's Eleventh Amendment immunity unless the state official is authorized by the state's constitution and laws to waive such immunity. "The district court is instructed to hear only those non-barred claims over which it has jurisdiction and remand the others to state court. If no such non-barred federal questions exist, the whole case is to be remanded to state court." *Id.*; *see also Silver v. Baggiano,* 804 F.2d 1211, 1214 (11th Cir. 1986).

[23] However, "[t]he test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 71 (1985). Thus, even a state constitutional provision providing that "[s]uits may be brought against the State in such manner and in such courts as shall be directed by law" was held "not enough to waive the immunity guaranteed by the Eleventh Amendment," because

> a State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued. ... Thus, in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in *federal court*. ... In view of these principles, we do not believe that [the state constitutional provision quoted above] constitutes a waiver of the State's constitutional immunity. This provision does not specifically indicate the State's willingness to be sued in federal court. Indeed, the provision appears simply to authorize the legislature to waive the State's sovereign immunity. In the absence of an unequivocal waiver specifically applicable to federal-court jurisdiction, we decline to find that California has waived its constitutional immunity.

*Id.* at 241, 105 S.Ct. at 3146-47 (emphasis in original) (citations omitted).

[24] A state official who has acted unconstitutionally may be sued in his official capacity for *prospective injunctive relief,* because such a suit "does not affect the State in its sovereign or governmental capacity," and, an official who commits an unconstitutional act is deemed "stripped of his official or representative character ...." *Ex parte Young,*

Finally, Congress can abrogate the states' Eleventh Amendment immunity, but only when it unequivocally expresses an intent to do so in the text of the statute itself,[25] and, acts pursuant to a valid grant of constitutional power, such as section 2 of the Fifteenth Amendment,[26] *South Carolina v. Katzenbach*, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966),[27] or section 5 of the Fourteenth Amendment.[28] *Fitzpatrick v. Bitzer*, 427 U.S. 445, 452-56, 96 S.Ct. 2666, 2669-71, 49 L.Ed.2d 614 (1975);[29] *see also Garrett*, 531 U.S. at ___, 121 S.Ct. at 962 (citing *Kimel*, 528 U.S. at

---

209 U.S. 156, 159-60, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908). The Eleventh Circuit observed that the doctrinal exception to Eleventh Amendment immunity created by *Young* "turns on three considerations: first, does the Plaintiff seek prospective or retrospective relief; second, is the violation ongoing and continuous; and finally, would equitable relief 'implicate special sovereignty interests.'" *Sandoval v. Hagan*, 197 F.3d 484, 500 (11th Cir. 1999) (quoting *Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997)) (some internal quotation marks omitted), *rev'd on other ground sub nom. Alexander v. Sandoval*, __ U.S. __, 121 S.Ct. 1511, __ L.Ed.2d __ (2001).

   [25] *See, e.g., Atascadero State Hospital*, 473 U.S. at 243, 105 S.Ct. at 3148 ("Congress must express its intention to abrogate the Eleventh Amendment [immunity of the states] in unmistakable language in the statute itself.").

   [26] Section 1 of the Fifteenth Amendment provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color or previous condition of servitude." Section 2 provides that "Congress shall have power to enforce this article by appropriate legislation."

   [27] The Supreme Court held in *South Carolina v. Katzenbach*, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), that the Voting Rights Act of 1965 was "appropriate" legislation to enforce the Fifteenth Amendment's protection against racial discrimination in voting, and found that, "[b]efore enacting the measure, Congress explored with great care the problem of racial discrimination in voting." *Id.* at 308, 86 S.Ct. at ___.

   [28] Section 1 of the Fourteenth Amendment provides, in part, that "No State shall ... deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Section 5 provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

   [29] The Supreme Court held in *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976), that "Congress may, in determining what is 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts." The Supreme Court summarized *Fitzpatrick* in *Seminole Tribe*, 517 U.S. at 59, 116 S.Ct. at 1125 (holding that Congress lacks the power under Article I to abrogate the states' sovereign immunity from suits commenced or prosecuted in federal courts), as follows:

> In *Fitzpatrick*, we recognized that the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal power struck by the Constitution. [427 U.S.] at 455, 96 S.Ct., at 2671. We noted that § 1 of the Fourteenth Amendment contained prohibitions expressly directed at the States and that § 5 of the Amendment expressly provided that "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article. See *id.*, at 453, 96 S.Ct., at 2670 (internal quotation marks omitted). We held that through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that § 5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that Amendment.

-10-

73, 120 S.Ct. at 640); *Will v. Michigan Department of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304,

2309-10, 105 L.Ed.2d 45 (1989); *Kentucky v. Graham*, 473 U.S. 159, 167 n.14, 105 S.Ct. 3099, 3106

n.14, 87 L.Ed.2d 114 (1985); *Harbert International, Inc. v. James*, 157 F.3d 1271, 1278 (11th Cir.

1998).  Further, the objectives of valid enforcement legislation "must be the carefully delimited

remediation or prevention of constitutional violations."  *College Savings Bank v. Florida Prepaid*

*Postsecondary Education Expense Board*, 527 U.S. 666, 672, 119 S.Ct. 2219, 2224, 144 L.Ed.2d

605 (1999) (citing *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)).

Defendant claims that none of the three exceptions described above apply to Dailey's claims

under the ADA, Rehabilitation Act, or state contract law.  This court agrees, but only in part.

**B.      Sovereign Immunity & the Americans with Disabilities Act**

Plaintiff's ADA claim clearly is barred.  The Supreme Court recently addressed the

applicability of Eleventh Amendment immunity to ADA claims in *Board of Trustees of the*

*University of Alabama v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), and held

that suits commenced by state employees to recover money damages for the State's failure to comply

with Title I of the ADA were barred.

While that decision is dispositive of plaintiff's ADA claim, it nevertheless merits further

development, as a preface to discussion of his claim under the Rehabilitation Act of 1973.

In *Garrett*, the Court began by reiterating the now familiar principle that Congress can

abrogate the states' Eleventh Amendment immunity when it unequivocally expresses an intent to

do so in the text of the statute itself, and, acts pursuant to a valid grant of constitutional authority.

The powers granted to Congress by Article I of the Constitution, however, are not sufficient

for that purpose: "Congress may not ... base its abrogation of the States' Eleventh Amendment

-11-

immunity upon the powers enumerated in Article I." *Garrett,* 531 U.S. at ___, 121 S.Ct. at 962 (citing *Kimel,* 528 U.S. at 79, 120 S.Ct. at 643 ("Under our firmly established precedent then, if the [Age Discrimination in Employment Act of 1967] rests solely on Congress' Article I commerce power, the private petitioners in today's cases cannot maintain their suits against their state employers."); *Seminole Tribe,* 517 U.S. at 72-73, 116 S.Ct. at 1131-32 ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction."); *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank,* 527 U.S. 627, 636, 119 S.Ct. 2199, 2205, 144 L.Ed.2d 575 (1999) ("*Seminole Tribe* makes clear that Congress may not abrogate state sovereign immunity pursuant to its Article I powers...."); *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,* 527 U.S. 666, 672, 119 S.Ct. 2219, 2219, 144 L.Ed.2d 605 (1999) ("[T]he power 'to regulate Commerce' conferred by Article I of the Constitution gives Congress no authority to abrogate state sovereign immunity."); *Alden v. Maine,* 527 U.S. 706, 730-33, 119 S.Ct. 2240, 2254-56, 144 L.Ed.2d 636 (1999)).

On the other hand, Congress may subject non-consenting States to suit in federal court when it does so pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment,[30] which authorizes Congress to enforce the substantive guarantees contained by § 1 of the Fourteenth Amendment[31] by "appropriate legislation." "Accordingly, the ADA can apply to the States only to

---

[30] In full text, Section 5 of the Fourteenth Amendment provides: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." *Id.,* § 5.

[31]Section 1 of the Fourteenth Amendment provides, in relevant part, that:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

the extent that the statute is appropriate § 5 legislation." *Garrett,* 531 U.S. at ___, 121 S.Ct. at 962.

Even so, because it ultimately is the prerogative of the Supreme Court, and not Congress, to define the substance of constitutional guarantees, remedial legislation purportedly based upon Congress' enforcement power under § 5 of the Fourteenth Amendment, to the extent that it "reach[s] beyond the scope of § 1's actual guarantees[,] must exhibit 'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Id.* at ___, 121 S.Ct. at 963 (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)).

> The first step in applying these now familiar principles is to identify with some precision the scope of the constitutional right at issue. Here, that inquiry requires us to examine the limitations § 1 of the Fourteenth Amendment places upon States' treatment of the disabled. As we did last Term in *Kimel*, see 528 U.S., at 83, 120 S.Ct. 631, we look to our prior decisions under the Equal Protection Clause dealing with this issue. ...
>
> . . . .
>
> Once we have determined the metes and bounds of the constitutional right in question, we examine whether Congress identified a history and pattern of unconstitutional employment discrimination *by the States* against the disabled. Just as § 1 of the Fourteenth Amendment applies only to actions committed "under color of state law," Congress' § 5 authority is appropriately exercised only in response to state transgressions. See ... *Kimel*, 528 U.S., at 89, 120 S.Ct. [at 649] ("Congress never identified an pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of [a] constitutional violation"). ...

*Garrett,* 531 U.S. at ___, 121 S.Ct. at 963, 964-65 (some citations omitted) (emphasis supplied).

Analyzing its Equal Protection Clause jurisprudence regarding disability, the Court found that disability is neither a "suspect," nor "quasi-suspect," classification. *Garrett,* 531 U.S. at ___, 121 S.Ct. at 963-64 (citing *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 87 L.Ed.2d 313,

---

U.S. Const. amend. XIV, § 1.

105 S.Ct. 3249 (1985)[32]). As a consequence, judicial review of state actions distinguishing between individuals on the basis of disability receive only the most deferential, "rational basis" scope of review, *Garrett,* 531 U.S. at ___, 121 S.Ct. at 963, and the contested employment action will be upheld if there exists "'a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Id.* at ___, 121 S.Ct. at 964 (quoting *Heller v. Doe,* 509 U.S. 312, 320, 125 L.Ed.2d 257, 113 S.Ct. 2637 (1993)).

> Thus, the result of *Cleburne* is that States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational. They could quite hard headedly — and perhaps hardheartedly — hold to job-qualification requirements which do no make allowance for the disabled. If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause.

*Garrett,* 531 U.S. at ___, 121 S.Ct. at 964.

The Supreme Court then examined whether Congress had identified a history and pattern of unconstitutional employment discrimination against the disabled by state governments, when considering adoption of the ADA. The Court observed that the legislative history of the ADA included remarkably little evidence of congressional findings of a "pattern of irrational *state* discrimination in employment against the disabled." *Id.* at ___, 121 S.Ct. at 965 (emphasis supplied). Comparing the legislative history of the ADA to that of the Voting Rights Act, which the Court upheld as appropriate legislation under § 2 of the Fifteenth Amendment in *South Carolina v. Katzenbach, supra,* the Court found a "stark" contrast between the two. *Garrett,* 531 U.S. at ___, 121 S.Ct. at 967-68. In the Voting Rights Act, Congress documented a marked pattern of

---

[32] In *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Court held *inter alia,* that mental retardation did not qualify as a "quasi-suspect" classification for equal protection purposes and, accordingly, a city ordinance requiring a special use permit for the operation of a group home for the mentally retarded incurred only the minimum "rational basis" review applicable to general social and economic legislation.

unconstitutional activity by the States, against which litigation had been ineffective.  Further, in that act Congress found an otherwise inexplicable 50 percentage point gap in the registration of white voters and voters of African heritage.  The legislative history of the ADA included no such evidence. *Id.* at ___, 121 S.Ct. at 967.

Accordingly, the Supreme Court held that the remedy employed by Congress when enacting the ADA was out of proportion to the purported violations of the Equal Protection rights of disabled individuals by the various states.  Congress thus had not validly abrogated the states' sovereign immunity, and, actions brought by private individuals against states for money damages under the ADA are barred by the Eleventh Amendment.  *Id.* at ___, 121 S.Ct. at 968.

**C.      Sovereign Immunity & the Rehabilitation Act**

The ADA and the Rehabilitation Act of 1973 are very similar.  Like the ADA, the Rehabilitation Act forbids states from discriminating on the basis of disability.[33]  Further, the standards for determining whether actionable discrimination has occurred are the same under both acts.  *See, e.g.*, 29 U.S.C. § 791(g); *Mullins v. Crowell,* 228 F.3d 1305, 1313 n.15 (11th Cir. 2000).  According to *Garrett*, the Equal Protection clause of the Fourteenth Amendment allows states to discriminate on the basis of disability, so long as there is "'a rational relationship between the disparity of treatment and some legitimate governmental purpose.'"  *Id.* at ___, 121 S.Ct. at 964 (quoting *Heller v. Doe,* 509 U.S. 312, 320, 125 L.Ed.2d 257, 113 S.Ct. 2637 (1993)).  The Rehabilitation Act, like the ADA, exceeds the requirements of the Fourteenth Amendment.

Even so, the inquiry into the validity of plaintiff's claims under the Rehabilitation Act is not ended by *Garrett*.  In that case, the Supreme Court held that private actions for money damages

---

[33]The provisions of § 504 of the Rehabilitation Act only apply to states receiving federal funds.  29 U.S.C. § 794(a).

could not be maintained against *non-consenting* states.  It did not address the exception to the

Eleventh Amendment that allows states to waive their immunity and *consent* to suit in federal court.

Section 1003 of the Rehabilitation Act Amendments of 1986 conditions a state's receipt of

federal funds on its consent to suit in federal court for violations of certain federal civil rights

statutes.  That section provides:

> A State shall not be immune under the Eleventh Amendment of the
> Constitution of the United States from suit in Federal court for a violation of *section
> 504 of the Rehabilitation Act of 1973* [29 U.S.C.A. § 794], title IX of the Education
> Amendments of 1972 [20 U.S.C.A. § 1681 et seq.], the Age Discrimination [in
> Employment] Act of 1975 [42 U.S.C.A. § 6101 et. seq.], title VI of the Civil Rights
> Act of 1964 [42 U.S.C.A. § 2000d et seq.], or the provisions of any other Federal
> statute prohibiting discrimination *by recipients of Federal financial assistance.*

42 U.S.C.A. § 2000d-7(a)(1) (bracketed citations in original) (emphasis supplied).

Section 504 of the Rehabilitation Act prohibits programs or activities that receive federal

financial assistance from discriminating against disabled individuals.  It provides:

> No otherwise qualified individual with a disability in the United States, as
> defined in section 706(8) of this title, shall, solely by reason of her or his disability,
> be excluded from the participation in, be denied the benefits of, or be subjected to
> discrimination *under any program or activity receiving Federal financial
> assistance....*

42 U.S.C. § 794(a) (emphasis supplied).  The ADA contains no such provision.

In *Sandoval v. Hagan*, 197 F.3d 484 (11th Cir. 1999), *rev'd on other grounds sub nom.*

*Alexander v. Sandoval*, __ U.S. __, 121 S.Ct. 1511, __ L.Ed.2d __ (2001), the Eleventh Circuit

addressed the issue of whether claims brought against a state governmental department under Title

VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (containing a provision conditioning

the receipt of federal funds upon acceptance of the act's terms[34]), were barred by the Eleventh

---

[34]42 U.S.C. § 2000d provides:

Amendment.  The plaintiffs in *Sandoval* challenged the policy of the Alabama Department of Public

Safety of administering its driver's license examination only in the English language.  They claimed

the policy constituted discrimination on the basis of national origin in violation of Title VI and other

statutes.  The Department of Public Safety claimed the suit was barred by the Eleventh Amendment.

*Id.* at 487.  The Eleventh Circuit disagreed, finding the State of Alabama had waived its immunity

and consented to suit in federal court when it had accepted conditional federal funds.

> It is an "unremarkable" commonplace that states may waive their sovereign
> immunity through overt consent.  *Seminole Tribe*, 517 U.S. at 65, 116 S.Ct. [at
> 1128]; *see also Cate v. Oldham*, 707 F.2d 1176, 1183 n.4 (11th Cir. 1983).  It is
> equally true that a state may waive its sovereign immunity by accepting federal
> funds.  Under the Spending Clause power of Article I, Congress is empowered to
> "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide
> for the common Defense and general Welfare of the United States."  Art. I, § 8, cl.
> 1.  As the Supreme Court repeatedly has recognized, "[i]ncident to this power,
> Congress may attach conditions on the receipt of federal funds ... 'to further broad
> policy objectives by conditioning receipt of federal moneys upon compliance by the
> recipient with federal statutory and administrative directives.'"  *South Dakota v.
> Dole*, 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (citations omitted).
> ...

*Sandoval*, 197 F.3d at 492.

The *Sandoval* court further observed that the Supreme Court has recognized the substantiality

of the Spending Clause power, and the ability of Congress to use it to accomplish objectives outside

the reach of Article I's "enumerated legislative fields."  *Id.* at 492-93.

Accordingly, the Eleventh Circuit held that, "under the Spending Clause power, the federal

government may condition a waiver of state sovereign immunity upon the receipt of federal monies."

*Id.* at 493.  Even so, the waiver is effective only if it meets certain requirements:

---

No person in the United States shall, on the ground of race, color, or national origin, be
excluded from participation in, be denied the benefits of, or be subjected to discrimination under any
program or activity receiving Federal financial assistance.

-17-

Specifically, under the Spending Clause power, the federal government may condition a waiver of state sovereign immunity upon the receipt of federal monies. *See Atascadero*, 473 U.S. at 238 n.1, 105 S.Ct. 3142 (noting that "a State may effectuate a waiver of its constitutional immunity ... by otherwise waiving its immunity in the context of a particular federal program"); *Edelman*, 415 U.S. at 672, 94 S.Ct. 1347 (noting that a state may waive immunity "by its participation in [a] program authorized by Congress"). However, a Spending Clause waiver requires an "unequivocal indication" that a State has consented to federal jurisdiction — either "'by the most express language or by such overwhelming implication from the text as (will) leave no room for any other reasonable construction.'" *Edelman*, 415 U.S. at 673, 94 S.Ct. 1347 (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1909)). To satisfy this "clear statement" waiver requirement, a statute must evince a 'clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity." *Atascadero*, 473 U.S. at 247, 105 S.Ct. 3142.

*Sandoval*, 197 F.3d at 493.

The Eleventh Circuit held that the "plain language" of § 1003 of the Rehabilitation Act Amendments of 1986 (2 U.S.C. § 2000d-7)

manifests an unmistakable intent to condition federal funds on a state's waiver of sovereign immunity. The Supreme Court has reached this conclusion, describing Section 2000d-7 as an 'unambiguous waiver of the States' Eleventh Amendment immunity.'" *See Lane v. Pena*, 518 U.S. 187, 200, 116 S.Ct. 2092, 2100, 135 L.Ed.2d 486 (1996) (drawing this conclusion in the context of a parallel Title IX provision).

*Sandoval,* 197 F.3d at 493.[35] The Eleventh Circuit noted that the Supreme Court has recently analogized federal funds to "'gifts' that a state may accept or reject of its own accord." *Id.* at 494 (citing *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 686-87, 119 S.Ct. 2219, 2231, 144 L.Ed.2d 605 (1999)).

---

[35]In *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), the Supreme Court held Congress had not validly abrogated the States' Eleventh Amendment immunity in the Rehabilitation Act because the statute did not contain "an equivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'" *Id.* at 239, 105 S.Ct. at 3146. Congress immediately responded by passing § 1003 of the Rehabilitation Act Amendments of 1986, which contained such an explicit waiver. 42 U.S.C. § 2000d-7(a)(1). In *Lane v. Pena*, 518 U.S. 187, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996), the Court acknowledged that Congress had responded to *Atascadero* with "care" by "crafting an unambiguous waiver of the States' Eleventh Amendment immunity in § 1003." *Id.* at 200, 116 S.Ct. at 2100.

> The Supreme Court has also recognized that "Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking of certain actions that Congress could not require them to take, and that acceptance of the fund[s] entails an agreement to the actions," so long as the conditions placed on these funds are not so "coercive" as to eviscerate the "voluntariness of [the] waiver."

*Id.* (quoting *College Savings Bank*, 527 U.S. at 686-7, 119 S.Ct. at 2231) (alteration in original).

Thus, the funds may induce, but must not compel, state action.

Applying the preceding framework, the Eleventh Circuit concluded: "we can find no constitutional defect inherent in the explicit state immunity waiver enacted pursuant to the Spending Clause in Section 2000d-7 [§ 1003]." *Sandoval*, 197 F.3d at 494.

Analogizing Spending Clause legislation to a contract, the Eleventh Circuit found a statute and its accompanying administrative regulations must provide recipient states with the "requisite level of notice for imposing funding conditions." *Id.* at 495. It then held that the nondiscrimination provision of Title VI provided "ample notice" of potential liability to state recipients of federal financial assistance. *Id.* For example, the statute itself "flatly prohibits" discrimination on the basis of national origin. *Id.* Further, the Supreme Court consistently has held that recipients of federal funds must comply with the nondiscrimination provisions in Title VI and the regulations promulgated in accordance with it. *Id.* Finally, several federal agencies had promulgated regulations implementing those provisions, including regulations prescribing when state recipients of federal funds must provide foreign language assistance. *Id.*

In the present action, therefore, this court must determine whether Congress clearly signaled its intent to condition a state's acceptance of federal funds on a waiver of its Eleventh Amendment sovereign immunity to actions premised upon the Rehabilitation Act. At issue here is § 1003 of the Rehabilitation Act Amendments of 1986, the same statute at issue in *Sandoval*. Although the

-19-

Eleventh Circuit's decision in *Sandoval* was later reversed by the Supreme Court, the Court based its reversal on other grounds,[36] and did not address the Eleventh Circuit's analysis of the Eleventh Amendment and waiver of sovereign immunity. Accordingly, this court finds that *Sandoval's* Eleventh Amendment holding still stands. The State of Alabama, including the Board of Trustees of the University of Alabama in Birmingham, was on notice that it could be held liable for employment discrimination on the basis of disability under the Rehabilitation Act. First, Section 504 of the Rehabilitation Act "flatly prohibits" discrimination on the basis of disability. *See id.* Further, the Supreme Court has held that recipients of federal financial assistance may be held liable under the Rehabilitation Act. *See, e.g., School Board of Nassau County, Florida v. Arline*, 480 U.S. 273, 275, 107 S.Ct. 1123, 1125, 94 L.Ed.2d 307 (1987); *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 443, 105 S.Ct. 3249, 3256, 87 L.Ed.2d 313 (1985) (acknowledging that Congress conditioned federal funds for education on a State's assurance that mentally disabled children will receive an appropriate education); *Atascadero*, 473 U.S. 234, 247, 105 S.Ct. 3142 3149-50 (Congress may condition acceptance of federal funds on a State's waiver of immunity if it manifests a clear intent to do so). Finally, § 1003 of the Rehabilitation Act Amendments of 1986 clearly and explicitly states: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United states from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 ... ." 42 U.S.C. § 2000d-7(a)(1). Thus, neither the State of Alabama nor its instrumentality, the Board of Trustees of the University of Alabama in Birmingham, can argue that it received inadequate notice that it could be held liable under the Rehabilitation Act.

---

[36]Sandoval v. Hagan, 197 F.3d 484 (11th Cir. 1999), *rev'd on other grounds sub nom.* Alexander v. Sandoval, __ U.S. __, 121 S.Ct. 1511, __ L.Ed.2d __ (2001) (holding there is no private right of action to enforce disparate-impact regulations promulgated under Title VI of Civil Rights Act of 1964).

Defendant contends, nevertheless, that the State's waiver was involuntary.  Due to the size

of the federal monetary grants at stake, defendant asserts the "point of coercion" has been passed.

This court disagrees.  The Eleventh Circuit has not specifically addressed the coercion argument.

However, several other courts have.  *In Jim C. v. United States*, 235 F.3d 1079 (8th Cir. 2000), the

Eight Circuit held that the waiver requirement for receipt of federal funds was not unconstitutionally

coercive.  *Id.* at 1082.  The court found the definition of "program or activity" in § 504 is narrow.

*Id.* Only the department or agency that receives the funds is affected. *Id.* at 1080.  "The acceptance

of funds by one state agency therefore leaves unaffected both other state agencies and the State as

a whole."  *Id.*  "The State may take the money or leave it."  *Id.* at 1082.  The holding in *Jim C.* is

compatible with the Eleventh Circuit's holding in *Sandoval*, and the holdings of other circuits. *See*

*Stanley v. Litscher*, 213 F.3d 340, 344 (7th Cir. 2000); *Clark v. State of California*, 123 F.3d 1267,

1271 (9th Cir. 1997).  Thus, plaintiff's claim under the Rehabilitation Act is not barred by the

Eleventh Amendment, and this court will examine its merits.

**D.      The Concept of "Disability" & the Rehabilitation Act**

The Rehabilitation Act of 1973 prohibits employment discrimination against otherwise

qualified individuals with a disability. *See, e.g., Mullins,* 228 F.3d at 1313; *Sutton v. Lader,* 185

F.3d 1203, 1207 (11th Cir. 1999).  "The standard for determining liability under the Rehabilitation

Act is the same as that under the ADA."  *Sutton,* 185 F.3d at 1207 n.5.  A plaintiff thus establishes

a prima facie case of discrimination under the Rehabilitation Act by showing (1) he has a disability,

(2) he is otherwise qualified for the position, and (3) he was subjected to unlawful discrimination

as a result of his disability. *See Mullins,* 228 F.3d at 1313; *Sutton,* 185 F.3d at 1207.  Here, plaintiff

cannot establish a *prima facie* case, because he has failed to demonstrate that he has a disability.

-21-

The Rehabilitation Act defines the concept of "disability" in a manner that includes any individual who: "(i) has a physical or mental impairment which *substantially limits* one or more of such person's *major life activities*; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment."   29 U.S.C.  §  705(20)(B) (emphasis supplied).   A person is "substantially limited" when he is:

(i)      Unable to perform a major life activity that the average person in the general population can perform; or

(ii)      Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Mullins*, 228 F.3d at 1314 (quoting 29 C.F.R.  §  1630.2(j)(1)).   "Major life activities" include "functions, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."   *Id.* at 1313 (quoting 29 C.F.R. § 1614.203(a)(3)).

A court should consider the following factors when determining whether an individual is substantially limited in the performance of a major life activity:  "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."   *Id.*

Plaintiff claims he has the impairment of being a recovering abuser of cocaine and alcohol. He contends his impairment "adversely affected his memory and thinking and he was unable to care for himself."[37] Further, he claims it impaired his ability to sleep, work, and live.[38] Nevertheless, the

---

[37]Plaintiff's memorandum in opposition to summary judgment (doc. no. 41) at 9.
[38]*Id.* at 9-10.

-22-

only evidence plaintiff has submitted to support his assertions is his own testimony.

Although plaintiff claims that he was unable to work or care for himself during the period of his substance abuse, he was able to maintain his employment at UAB for five years.[39] Even when his abuse was most severe, plaintiff still was able to perform satisfactorily all of his duties and responsibilities.[40] The only work-related problems caused by his impairment were occasional absences, the bulk of which occurred before May of 1995, when his abuse became severe.[41] Plaintiff received no rehabilitation, counseling, or other medical treatment for substance abuse prior to his treatment at Bradford Health Services in 1995.[42] Although he claims the substance abuse interfered with his sleep, he has failed to submit medical or other evidence demonstrating such interference. Plaintiff claims he was impaired in his ability to eat, but the medical records of his treatment at Bradford do not mention that he was malnourished either prior to or during his inpatient treatment. He received only conservative treatment with counseling and vitamins.[43] Further, Shouse did not suspect that plaintiff had a drug problem before he was informed by plaintiff.[44] In sum, plaintiff has failed to submit any evidence that his substance abuse substantially limited a major life activity. Accordingly, this court concludes that plaintiff's substance abuse substantially limited the major life activity of working only during the period of his inpatient treatment at Bradford. Temporary impairments are not disabilities, however. *See Sutton*, 185 F.3d at 1209. This court further finds

---

[39]*Id.* at 14. For an impairment to substantially limit the major life activity of working, plaintiff must allege that he is unable to work in a broad class of jobs. *See* Sutton v. United Air Lines, Inc., 527 U.S. 471, 491, 119 S.Ct. 2139, 2151, 144 L.Ed.2d 450 (1999). Here, plaintiff has failed to demonstrate that he is unable to work in even his own job, much less a broad class of jobs.

[40]*Id.*

[41]*Id.* at 13.

[42]*Id.* at 16.

[43]*Id.*, Ex. 1.

[44]Defendant's evidentiary submission (doc. no. 33), Shouse deposition at 19-20.

plaintiff has submitted no evidence that he is substantially limited in the major life activities of sleeping, eating, memory, or living.  Because plaintiff was only temporarily impaired at best, the court finds he is not disabled.

Plaintiff also contends that he was "regarded as disabled."  Plaintiff asserts that defendant regarded him as a current drug user, and thus regarded him as excluded from the protections of the Rehabilitation Act.[45]  Plaintiff's argument defies common and legal sense.  The Rehabilitation Act does not require that UAB regard plaintiff as meeting the legal definition of "disabled."  Instead, plaintiff must demonstrate that UAB perceived him to have an impairment that is "substantially limiting" and significant.  *Sutton*, 185 F.3d at 1208.  He has failed to do so.  Shouse, plaintiff's immediate supervisor, testified that he was unaware of plaintiff's substance abuse problem before plaintiff entered rehabilitation.[46]  Plaintiff testified that his performance at work had been satisfactory at all times prior to his admittance to Bradford.[47]  Even after plaintiff returned to work, he was not regarded as being significantly or substantially limited in his ability to perform.  Indeed, Shouse testified that plaintiff was more productive after he returned from rehabilitation.[48]  Most tellingly, plaintiff continued to work for UAB on an occasional contract basis.[49]

**E.    Termination "Because of Disability"**

Even if plaintiff had demonstrated that his substance abuse substantially limited a major life activity, he failed to demonstrate that his employment was terminated because of his substance

---

[45]The Rehabilitation Act excludes from the definition of "individual with a disability" anyone who "is currently engaging in the illegal use of drugs, when a covered entity acts on the basis of such use."  29 U.S.C. § 705(20)(C)(i). Although current drug users are excluded from the definition of "individual with a disability," that section provides a "safe harbor" for former users of illegal drugs who have been rehabilitated.  29 U.S.C. 705(20)(C)(ii).

[46]Defendant's evidentiary submission (doc. no. 33), Shouse deposition at 19-20.

[47]Plaintiff's evidentiary submission (doc. no. 43), Tab 1 at 13-14.

[48]Defendant's evidentiary submission (doc. no. 33), Shouse deposition at 16

[49]*Id.* at 21-23.

-24-

abuse. Disparate treatment under the Rehabilitation Act is established either by direct evidence of discriminatory intent or, where no such evidence is proffered, by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and then elaborated in its progeny. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also Mitchell v. Crowell*, 975 F. Supp. 1440, 1445-46 (N.D. Ala. 1997).

Under the *McDonnell Douglas* framework, plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. If he does so, the burden of production shifts to defendant to rebut the presumption of intentional discrimination by articulating legitimate, nondiscriminatory reasons for plaintiff's discharge. *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. If defendant carries its burden, plaintiff has an opportunity to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825), *cert. denied sub nom. Combs v. Meadowcraft Co.*, 522 U.S. 685, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). Plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct' ...." *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)). The plaintiff shoulders that burden by demonstrating "such weaknesses,

-25-

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."

*Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. duPont de Nemours & Company*, 100 F.3d 1061,

1072 (3d Cir. 1996)) (internal quotation marks omitted).

Here, defendant has offered a legitimate, nondiscriminatory reason for discharging plaintiff:

he violated the return to work agreement. Plaintiff has failed to offer any evidence from which this

court could conclude that defendant's legitimate, non-discriminatory reason is a pretext for

discrimination. He signed a "Statement of Guidelines for Impaired Employees," agreeing to submit

to random drug screens and screens based on reasonable suspicion.[50]  He acknowledged his

understanding that "[f]ailure to submit to a screen or a positive test result may result in termination

without notice."[51] He also signed forms acknowledging that he understood the color code systems.[52]

Further, the memorandum plaintiff received from Reita Mann warned: "Failure to complete the new

forms could jeopardize your compliance with your recovery program guidelines."[53]

In short, plaintiff was not discharged because he was a substance abuser. Rather, he was

discharged because he failed to comply with the clearly articulated written instructions contained

in his return to work agreement. Approximately two hundred employees have participated in the

drug screening program.[54] Eight other employees were discharged because they failed to submit to

a drug screening under the color code system.[55] Two of those employees took a drug test on their

---

[50]Plaintiff's evidentiary submission (doc. no. 43), Tab 1, Ex. 3.

[51]*Id.*

[52]*Id.*, Exs. 4 & 6.

[53]*Id.*, Ex. 5.

[54]*Id.*, Tab 3 at 84.

[55]*Id.*, Ex. 4.

own, and submitted the results to Mann.[56] Despite negative test results, the two employees still were discharged.[57] Employees consistently are terminated when they fail to submit to a drug screen, regardless of whether they actually had been using drugs.

**F.    Sovereign Immunity & Plaintiff's Breach of Contract Claim**

Finally, Dailey's breach of contract claim is based upon Alabama law, and it clearly is barred by the law of that State. "Article I, § 14, Alabama Constitution of 1901, provides that 'the State of Alabama shall never be made a defendant in any court of law or equity.' Under this provision, the State and its agencies have absolute immunity from suit in any court." *Ex parte Franklin County Department of Human Resources*, 74 So.2d 1277, 1279 (Ala. 1996); *see also Regents of the University of California v. Doe*, 519 U.S. 425, 429-31, 117 S.Ct. 900, 903-5, 137 L.Ed.2d 55 (1997).

## IV. CONCLUSION

An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this the 31st day of July, 2001.

_____
United States District Judge

---

[56]*Id.* at 65-66.

[57]Plaintiff's memorandum (doc. no. 41) at 7.

-27-